**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

DEBORAH A. DOOLEY,

        **Plaintiff,**

v.             **//**    **CIVIL ACTION NO. 1:13CV1**
                             **(Judge Keeley)**

MYLAN PHARMACEUTICALS, INC.,

        **Defendant.**

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS,
INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

Pending before the Court is the motion for summary judgment
filed by the defendant, Mylan Pharmaceuticals, Inc. ("Mylan").
(Dkt. No. 141). For the reasons discussed during the March 29, 2014
hearing on the motion, and for those that follow, the Court **GRANTS**
Mylan's motion.

**I. PROCEDURAL HISTORY**

On November 27, 2012, the plaintiff, Deborah Dooley
("Dooley"), sued Mylan in the Circuit Court of Monongalia County,
West Virginia. Mylan subsequently removed the action to this Court
on January 2, 2012, in accordance with 28 U.S.C. §§ 1331, 1367,
1441, and 1446. (Dkt. No. 1).

After filing a series of amended complaints, Dooley filed her
fifth, and final, amended complaint on June 28, 2013, in which she
alleged claims against Mylan for racial discrimination, harassment,
retaliation, and intentional infliction of emotional distress.
(Dkt. No. 60). On January 13, 2014, Mylan filed a motion for
summary judgment based on a "Last Chance Agreement" that it had

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

entered into with Dooley on June 24, 2009. (Dkt. No. 139). The Court granted that motion on April 1, 2014. (Dkt. No. 162). Mylan then filed the instant motion for summary judgment, (dkt. no. 141), which is fully briefed and ripe for review.

## II. FACTUAL BACKGROUND

The material facts in this case are largely undisputed and the Court has considered all inferences to be drawn from the facts in the light most favorable to the plaintiff. Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 574, 574 (1986).

### A. Dooley's Employment History With Mylan

Dooley was hired by Mylan on March 25, 2002, as a tablet inspector at its plant in Morgantown, West Virginia. (Brunette Aff. ¶ 9). As a bargaining unit employee, the terms and conditions of her employment were governed by a collective bargaining agreement ("the Agreement") between Mylan and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied, Industrial and Service Workers International Union (the "Union"). Id. at ¶ 7.

Mylan terminated Dooley's employment in April, 2002, for a violation of the company's anti-nepotism policy. (Pl. Tr., 63:5-23; 64:22-65:1). Dooley sued Mylan over this termination, a dispute which the parties eventually settled in September, 2005. As part of that settlement, Mylan agreed to reinstate Dooley as an

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

employee. (Brunette Aff. ¶ 9). More than two (2) years later, on November 12, 2007, pursuant to the terms of the collective bargaining agreement, Dooley transferred to the position of Clerk in the Label Control Department, where she remained until she resigned her employment in August, 2013. (Pl. Tr., 69:22-71:5).

**B. Dooley's Bereavement Leave**

While employed in the Labor Control Department, Dooley requested bereavement leave on June 2, 2009, to attend the funeral of "her daughter's grandfather" in Las Vegas. (Pl. Tr., 193:9 – 194:4). Helen Bertalan, day shift supervisor, completed a "Death in the Family" form, which Dooley then signed, that indicated her request for bereavement leave was due to the death of her father-in-law. (Pl. Tr., 190:17 – 191:24); (Brunette Aff. ¶ 13, Ex. M). After Dooley returned from Las Vegas, however, Mylan's Human Relations Department discovered that the funeral she had attended was actually that of her ex-father-in-law, a relationship that did not entitle her to bereavement leave under Mylan's policy. (Pl. Tr., 191:18-21); (Brunette Aff. ¶ 14).

Due to this apparent violation of the bereavement leave allowed under Mylan's policy, Mylan suspended Dooley on June 12, 2009, pending completion of an investigation into the matter. (Brunette Aff. ¶ 15, Ex. N). Following that investigation, Jessica

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

Pforr, Senior Human Relations Associate at Mylan, confirmed that Dooley had attended the funeral of her ex-father-in-law, which violated Mylan's Code of Conduct. (Pl. Tr. p. 195:6-19). Rather than terminate her employment for violating the company's Code of Conduct, however, Mylan entered into a Last Chance Agreement with Dooley and the Union that had represented her during Mylan's investigation into the matter. (Brunette Aff. ¶ 16, Ex. O). As part of that Agreement, Dooley acknowledged she had engaged in conduct violative of Mylan's Code of Conduct that warranted termination of her employment. Id. Mylan, Dooley and the Union then "agreed that, in lieu of termination of [her] employment, Dooley [would] return to work" subject to the terms of the Agreement, which included a fifteen day suspension and waiver of any claims Dooley might have against Mylan relating to any events occurring prior to entering into the Agreement. Id. (Emphasis added). Dooley ultimately returned to work on July 9, 2009. Id. at ¶ 17, Ex. P.

**C. Dooley's Complaints Regarding E-Mail Messages**

Approximately two (2) years after she entered the Last Chance Agreement, on June 23, 2011, Dooley filed a complaint via e-mail with Mylan's Corporate Compliance Department, to which she attached e-mail messages from two co-workers, Joyce Jones ("Jones") and Rob Barker ("Barker"), that she found to be inappropriate. (Goletz Aff

## MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]

¶ 6, Ex. X). She complained that Jones had sent her e-mails stating Mylan had been sold to another company, and that Barker had sent e-mails that were "political contraband." Id. The e-mail messages sent by Jones and Barker forwarded to Mylan by Dooley were dated April 23, 2010, June 24, 2010, September 15, 2010, and September 28, 2010. Id.

Pursuant to company policy, Jim Brunette ("Brunette"), Mylan's Manager of Employee Relations, investigated Dooley's complaint. (Brunette Aff. ¶ 19). In doing so, he conducted interviews with Jones and Barker regarding their e-mail messages, during which he informed them about Mylan's harassment policy. Id. at ¶ 20. It is undisputed that, following these interviews, Dooley received no more offensive e-mail messages from Jones. Id.

On September 5, 2012, however, Dooley filed another complaint with Mylan's Corporate Compliance Department regarding other offensive e-mail messages she had received. (Goletz Aff. ¶ 8, Ex. Y). In this instance, she forwarded e-mail messages containing political jokes, primarily related to President Obama's economic policies. Id. After receiving her complaint, Tom Pirozzi ("Pirozzi"), Mylan's Vice President and Chief Compliance Officer, attempted to schedule a meeting with Dooley to discuss her complaint. Id. at ¶ 10, Ex. Z. Dooley responded by requesting that

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS
INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

she be allowed to have her attorney present during the meeting. Pirozzi informed Dooley that, pursuant to the Agreement, she was entitled to have a representative of the Union present, but not an attorney. Id. Following this exchange, Dooley never responded further to Pirozzi's request to meet with her, and no meeting occurred.

**D. Dooley's Parking Violations**

On August 11, 2011, Mylan's Corporate Compliance Department received an anonymous complaint about Dooley parking in a reserved space, rather than in the general parking lot designated for bargaining unit employees. Id. at ¶ 11, Ex. AA. The caller indicated that he had received a ticket after parking in a reserved space, but Dooley had not. As a result of the complaint, Mylan conducted an investigation into the matter. Id.

The next day, August 12, 2011, Shane Swick ("Swick"), Label Control Supervisor, observed Dooley parking in a reserved space, and requested that she move her car and park in the general parking lot in the future. Id. at ¶ 13, Ex. BB. Despite this, on August 17, 2011, Dooley again parked in a reserved parking space and received a parking ticket as a consequence. Id. at ¶ 14, Ex. BB.

The next day, August 18, 2011, Dooley met with George Spanovich ("Spanovich"), Senior Manager of Corporate Security, to

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

discuss parking related concerns.  <u>Id</u>. at ¶ 15, Ex. BB.  At that meeting, she told Spanovich she was being singled out for scrutiny regarding parking, and also that she needed to park in a reserved space because she had a foot injury that prevented her from walking long distances. <u>Id</u>. at ¶ 16, Ex. BB. Spanovich assured Dooley she was not being singled out for scrutiny, and also suggested that she visit with an employee nurse in order to obtain a reasonable parking accommodation for her foot injury. Dooley, however, never sought such an accommodation. <u>Id</u>.

**E. Dooley's Complaints Regarding Post-It Note in Cubical**

On March 22, 2012, Brunette held an employee meeting regarding issues in the Label Control Department. (Brunette Aff. ¶ 23, Ex. T).  During that meeting, Dooley reported that, a year earlier, she had found a post-it note in her cubicle that read "Bid Out Black Bitch." <u>Id</u>. She admitted that she had not provided anyone at Mylan with the original, or even a copy, of the note, and that she had not previously reported receiving it.  <u>Id</u>. at  ¶ 25, Ex. T. Brunette requested that she bring a copy of the note to him so that he could initiate an investigation.  <u>Id</u>. at ¶ 26, Ex. T.  On the next day, March 23, 2012, however, Dooley informed Swick, the Label Control Supervisor, that she would not provide Brunette with a copy of the note. <u>Id</u>.  Consequently, because Dooley had discovered the

7

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS
INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

offending note over a year before reporting it to Mylan and then refused to provide anyone with either the original or a copy of it, Mylan was unable investigate the matter further. Id. at ¶ 27; see also, (Brunette Dep., 67:10-11) ("I had nowhere to go, nowhere to start, nowhere to start that investigation.").

**F. Dooley's Resignation from Mylan**

On January 16, 2013, Dooley stopped reporting to work as a result of medical issues related to workplace stress and depression. (Pl. Tr., 76:16-23). On July 19, 2013, she informed Swick via an e-mail that she would be medically cleared to return to work on July 29, 2013. Id. at 255:13-23. Swick responded by providing her with instructions for returning to work, including the suggestion that she check in with Bobbi Neal ("Neal"), employee nurse, and Susan Dotson ("Dotson"), Human Resources Representative, so that any procedures necessary to accommodate her return could be addressed. Id. at 255:24-256:17. Dooley, however, never checked in with either Neal or Dotson.  Id. at 257:3-16.

On July 24, 2013, Swick sent Dooley another e-mail message to provide additional information regarding her return, including information about a new dress code and a locker assignment. (Brunette Aff. Ex. V). Despite these communications, Dooley never returned to work at Mylan. Id. Rather, on July 31, 2013, she mailed

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

a letter to Swick announcing her resignation effective August 7, 2013. Her letter stated her resignation was due to discriminatory treatment, and that her "complaints of age, race, sex, disability, et cetera, discrimination have fallen on deaf ears." (Pl. Tr., 268:22-269:7).

### III. LEGAL STANDARD

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

### IV. ANALYSIS

### A.   Racial Discrimination Claims (Counts One and Four)

Dooley alleges that Mylan discriminated against her on the basis of race in violation of Title VII, Section 1981, and the Human Rights Act. (Dkt. No. 60). Specifically, she contends that she received fewer job assignments than her co-workers, was issued a parking ticket, and was constructively discharged, solely because of her race.

When evaluating a plaintiff's racial discrimination claims, courts apply the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The McDonnell Douglas framework imposes on a plaintiff the initial burden of establishing a *prima facie* case of employment discrimination. Once that *prima facie* case has been established, the burden shifts to the employer to articulate a nondiscriminatory reason for its action. If the employer establishes such a reason, the burden shifts back to the plaintiff to show that the reason articulated by the employer was merely a pretext. Lewis v. Potter, 2007 U.S. Dist. LEXIS 7825, 2007 WL 419374 (N.D. W. Va. Feb. 2, 2007).

To establish a *prima facie* case of discrimination under the facts here, Dooley must establish the following: 1) that she is a member of a protected class; 2) that she performed her job

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

satisfactorily; 3) that she suffered an adverse employment action; and 4) that Mylan treated employees outside of her protected class differently. <u>Coleman v. Maryland Court of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010). Mylan contends that Dooley is unable to satisfy this test.

Dooley, an African-American woman, is a member of a protected class. Further, as her supervisor stated in his deposition, she performed satisfactory work. (Swick Dep., 9:3-6). Thus, the only questions for the Court to determine are whether Dooley suffered an adverse employment action, and whether Mylan treated Caucasian employees differently than she was treated.

**1. Adverse Employment Action**

In order for Dooley to establish that she suffered an adverse employment action, she must provide evidence that she was subject to a "significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998). Here, as has been noted earlier, Dooley alleges that she was given fewer job assignments than her co-workers, received a parking ticket, and was constructively discharged while working at Mylan.

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

As to her job assignments, Dooley argues that less senior Label Control Clerks were given opportunities over her, such as running print jobs for research and development labels, and working in the department's reconciling area. (Pl. Tr., 141:11-142:6). The fact that Dooley received fewer job tasks than her co-workers, however, does not in and of itself constitute an adverse employment action. As she readily admitted in her deposition, the decrease in tasks did not lead to a change in pay or conditions of her employment. Id. at 142:7-16.

Similarly, Dooley's receipt of a parking ticket did not change the terms and conditions of her employment, and thus did not constitute an adverse employment action. (Brunette Aff. ¶ 22). Furthermore, it is undisputed that she received the ticket after repeatedly parking without permission in a reserved space. The parking ticket did not result in any disciplinary action or fine. Instead, Mylan attempted to assist Dooley by recommending that she seek parking accommodations for an injured foot. Id.

Dooley also argues that she was constructively discharged from her job at Mylan. (Dkt. No. 150). Notably, however, Dooley never alleged the issue of constructive discharge in her complaint. Although she moved to amend her complaint for a sixth time in order to add a separate claim for constructive discharge, the Court

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

denied that motion, made after discovery had closed, as untimely. (Dkt. No. 144); See Foman v. Davis, U.S. 178, 182 (1962)(holding that leave to amend should be denied upon a showing of undue delay and repeated failure to cure deficiencies by amendments previously allowed); Kerns v. Range Resources-Appalachia, LLC, 2011 WL 3753117 *3 (N.D.W.Va. 2011). Thus, Dooley has no claim of constructive discharge pending in this case. Nevertheless, even had she raised the issue of constructive discharge in a timely manner, her claim would fail for the following reasons.

In order to state a claim for constructive discharge, Dooley must establish that Mylan made her working conditions intolerable, thereby forcing her to quit her job. Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985). Dooley alleges that she was forced to resign from Mylan following an extended medical leave of absence caused by work-related stress and depression, and also because she was subjected to unnecessary administrative procedures, including being directed to contact Neal and Dotson prior to her return. (Dkt. No. 150). Dooley's argument, however, grossly misrepresents the factual nature of her situation.

It is undisputed that she was off work from January 16, 2013, until she was medically cleared to return to work on July 29, 2013. (Pl. Tr., 76:16-19; 255:13-20). Only the period of time from

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

January 28, 2013 through March 14, 2013, was due to any work-related psychological problems. (Dean Decl. Ex. B). Her absences after that date were due to preexisting pulmonary and orthopedic problems. Id.

Swick, Dooley's supervisor, welcomed her back to work in an e-mail message and sent her other messages encouraging her to return to work and providing the necessary instructions and information to assist her return. (Pl. Tr., 255:13-259:1). Dooley's argument, that Swick's directive to call Neal and Dotson to discuss her return was "completely unnecessary and overly burdensome," id., is wholly without merit. Swick only recommended that Dooley call Neal and Dotson to ensure that she was reactivated in the electronic timekeeping system and received any necessary accommodations for ongoing health issues.

Under any objective analysis, these messages were unthreatening, arguably even helpful, administrative actions. (Dotson Dep., 47:8-9). Further, Dooley had undertaken similar procedures upon returning from prior leaves of absence. (Id. at 39:22-40:6). Thus, there are no material facts in dispute as to whether Mylan acted intentionally to cause Dooley's resignation, or from which a fact finder could conclude that her working conditions

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS
INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

were so intolerable that a reasonable person in her position would
have felt compelled to resign. Bristow, 770 F.2d at 1255.

### 2. Mylan's Treatment of Caucasian Employees

Dooley also must establish that Mylan treated other, similarly
situated persons outside of her protected class more favorably.
Coleman, 626 F.3d at 190. In an attempt to do so, she first asserts
that Mylan treated Caucasian employees preferentially with respect
to receiving job opportunities and parking privileges.[1] (Dkt. No.
60). Her evidence, however, utterly fails to substantiate those
assertions. In point of fact, the evidence introduced by the
parties establishes that all bargaining unit employees, regardless
of race, were given equal opportunity to take on new job
assignments, and also were required to park in the same general
parking area. (Brunette Aff. ¶ 22); (Goletz Aff. ¶ 11).

Dooley further asserts that she was disparately treated when
she attempted to return to work on July 29, 2013, following her
extended medical leave. (Dkt. No. 60). She claims no Caucasian
employee had to undergo the unnecessary and overly burdensome
procedures Swick required her to undertake, such as informing Neal

---

[1] In her Complaint, Dooley also argues that Mylan treated non-
minority employees differently with respect to bereavement leave.
The Court, however, dismissed this claim as time barred under the
Last Chance Agreement that Dooley entered into with Mylan. (Dkt.
No. 162).

and Dotson about her return. She also offers the affidavit of Julia Boone, a fellow African American co-worker, to establish that Boone also was forced to undergo unnecessarily burdensome procedures following a medical leave.

As this Court has already concluded, the procedures Swick asked Dooley to undertake were not burdensome, but rather reasonably related to her return to work. Moreover, Dooley has failed to present even a scintilla of evidence that any Caucasian employee returning from an extended medical leave did not receive the same or similar directions.

Furthermore, the affidavit of Boone is not something that this Court may fairly consider at this stage of the litigation given that Dooley failed to disclose Boone's name as a witness during discovery. _See_, Fed. R. Civ. P. 26(a)(1); <u>Ace American Insurance Co., et. al., v. McDonald's Corp.</u>, 2012 WL 2523883, (D.Md. June 28, 2012) (finding that witness disclosures made after the close of discovery are untimely). Despite having filed initial disclosures and formal answers to interrogatories regarding the names and contact information of individuals she intended to use as witnesses, Dooley never disclosed Boone's name until she attached Boone's affidavit to her response to Mylan's motion for summary judgment. See, <u>Frazier v. Layne Christensen Co.</u>, 370 F.Supp.2d 823,

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

827 (W.D. Wis. 2005)(striking affidavits submitted in support of summary judgment motion because affiants were not identified in Rule 26(a) disclosures). Thus, Dooley cannot rely on Boone's affidavit to establish a *prima facie* case of racial discrimination.[2]

**B.   Racial Harassment (Counts One, Three, Four, and Six)**

Dooley also alleges that Mylan subjected her to racial harassment. (Dkt. No. 60). In support of this allegation, she contends she found an inappropriate post-it note in her cubical, and also received discriminatory e-mail messages while working at Mylan.[3] (Dkt. No. 60).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's....race." 42 U.S.C. 2000e-2(a)(1) (2000). "Since an employee's work environment is a term or condition of employment,

---

[2]Because Dooley has failed to establish a *prima facie* case of discrimination, the Court need not perform the remainder of the McDonnell Douglas analysis. 411 U.S. at 802.

[3]Dooley also asserts that, in 2007, she was referred to as a "lazy nigger," and in 2008, she was treated rudely by co-workers at Mylan. However, these claims were dismissed as time-barred pursuant to the Last Chance Agreement Dooley entered into with Mylan. (Dkt. No. 162).

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

Title VII creates a hostile working environment cause of action." EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001).

In order to prove that Dooley suffered from a "discriminatorily hostile or abusive work environment," Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.E.2d. 295 (1993), she must demonstrate that the harassment was 1) unwelcome, 2) based upon her race, 3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and 4) imputable to her employer. Ocheltree v. Scollon Productions, Inc., 335 F.3d 331 (4th Cir. 2003). The parties do not contest that the alleged harassment was unwelcome; what they do disagree about is whether the remaining elements of the claim have been established.

**1. Harassment Based Upon Race**

In order to survive summary judgment, Dooley must present sufficient evidence that the alleged harassing conduct "was motivated by [racial] animosity." Gilliam v. South Carolina Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007). She asserts that the post-it note in her cubicle reading "Bid Out Black Bitch," and the derogatory e-mail messages she received from co-workers, were racially motivated.

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

There can be no debate that the words on the post-it note sufficiently evince harassment based on Dooley's race. However, the substance of the e-mail messages she received do not establish a *prima facie* case that they were racially based.

Turning to the content of those messages, Dooley complained that her co-worker, Jones, informed other co-workers via e-mail that the CEO had sold Mylan. She also complained that Barker, and others, sent e-mail messages that were "political contraband." (Goletz Aff. Ex. X). Clearly, Jones's e-mail had no racial basis; moreover, Dooley never complained to anyone at Mylan that the other e-mail messages, which she described as "political contraband," were racially motivated. (Goletz Aff. ¶ 7, Ex. X). Rather, she stated that she wished to stop receiving them. Id.

The e-mail messages described by Dooley as "political contraband" stated: "America needs Obamacare like Nancy Pelosi needs a Halloween mask;" "If Nancy Pelosi and Obama were on a boat in the middle of the ocean and it started to sink, who would be saved? America;" and a newspaper article entitled "Mylan Pharmaceuticals Stabbing Faked." Based on the content of these messages, which dealt mainly with politics and office gossip, not race, Dooley has failed to meet her burden of establishing a *prima facie* case that those messages were racially motivated.

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS**
**INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

### 2. Severe or Pervasive Racial Harassment

Next, Dooley must establish that the alleged racial harassment she suffered while at Mylan was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris, 510 U.S. at 21, 114 S.Ct. 367. Specifically, she must identify instances where the environment was "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." EEOC v. Subelt Rentals Inc., 521 F.3d 306, 316 (4th Cir. 2008). Further, she must establish that the environment was both subjectively and objectively abusive. Id.

### a. Subjective Abuse

In response to Dooley's argument that the work environment at Mylan was subjectively abusive, Mylan asserts that only the post-it note involved the issue of race, and the evidence establishes that she was not substantially affected by it. (Dkt. No. 142).

Dooley waited over a year to report the existence of the post-it note, and then hindered Mylan's investigation into the matter by refusing to produce a copy of the note when her supervisor asked her to do so. Further, she has neither alleged nor offered any evidence that receiving the post-it note interfered with her work performance, or was physically threatening or humiliating. Thus,

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

based on the totality of the circumstances, the Court cannot find that Dooley has established a *prima facie* case of subjective abuse.

### b. Objective Abuse

Mylan further contends that, even if Dooley could establish a *prima facie* case of subjective abuse, she has not established that her work environment was objectively abusive. <u>Id</u>. It argues that the instances described by Dooley are the kind of common, petty occurrences found in many workplaces. Dooley responds that a reasonable person in her position would have found the environment at Mylan abusive. (Dkt. No. 150).

When determining whether harassing conduct was "objectively severe or pervasive," a court must look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id</u>. In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." "Simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the terms and conditions of employment." <u>Id</u>.

## MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]

### 1) Post-It Note

From the totality of the evidence surrounding Dooley's receipt of the post-it note, it is clear that the incident involved an isolated instance of inappropriate workplace behavior that did not "amount to discriminatory changes in the terms and conditions of [Dooley's] employment." Id. The Fourth Circuit previously has concluded that similar conduct does not rise to the level of severe and pervasive harassment. Mosby-Grant v. City of Hagerstown, 630 F.3d 326 (4th Cir. 2010) (no severe and pervasive conduct where employee overheard racial jokes between two co-workers – one in protected class – and also overheard two offensive remarks directed at individuals in another protected class within five months); Lacy v. Amtrak, 205 F.3d 1333 (4th Cir. 2000) (no severe and pervasive conduct where employee claims manager called her "black bitch" outside her presence, derogatory cartoons place in her locker, she was reprimanded, and unfairly overloaded with work assignments). Thus, Dooley has failed to meet her burden of establishing that the post-it note created an objectively abusive work environment.

### 2) E-Mail Messages

The e-mail messages Dooley received were not racially motivated, but rather related to politics and office gossip. Even assuming that they were racially motivated, however, Dooley must

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

still show that they created an objectively hostile work environment.

Courts have consistently held that such e-mail messages are insufficient to establish severe and pervasive racial harassment. See, Gibbs v. Brown Univ., No. 09-cv-392 WL 1299950 (D.R.I. Mar. 31, 2011 (racially inflammatory e-mail comment that Obama would be "assassinated and would "never be president because he was black" did not support a hostile work environment claim); Rozier v. United Metal Fabricators, Inc., No. 3:09-cv-257, 2012 WL 170197 (W.D.Pa. Jan. 19, 2012) (racial slurs regarding then-candidate Barack Obama were neither sufficiently severe nor pervasive to constitute hostile work environment); Shuler v.Corning, No. 4:09-cv-19, 2008 WL 3929139 (W.D.Va. Aug. 21, 2008) (comments about then candidate Barack Obama's race and use of the term "black" were insufficient to constitute hostile work environment); Shaw v. City of W. Monroe, No. 12-cv-0318, 2013 WL 1385628 (W.D.La. Apr. 3, 2013) (pictures of men hanging, anti-Obama political cartoons, and co-worker's use of "nigger" insufficient to constitute hostile work environment). Consistent with such legal precedent, the e-mail messages Dooley received cannot be construed as sufficiently severe and pervasive as to constitute a *prima faci*e case of objective abuse. Thus, the Court concludes that Dooley's receipt of the post-it note and e-

mail messages does not constitute a racially hostile work environment.

### 3. Imputability of Racial Harassment to Mylan

Finally, even if Dooley could establish a racially hostile work environment, she also must establish "some basis for imputing liability on" Mylan. <u>Gilliam</u>, 474 F.3d at 142. An employer is "subject to vicarious liability to a victimized employee for an actionable hostile work environment created by supervisor with immediate authority over the employee." <u>Burlington Industries, Inc. V. Ellerth</u>, 524 U.S. 742, 765 (1998). Further, when an employee is racially harassed by a co-worker, rather than a supervisor, an employer is only liable "if it knew or should have known about the harassment and failed to take effective action to stop it." <u>Howard v. Winer</u>, 446 F.3d 559, 565 (4th Cir. 2006).

Here, Dooley does not allege that she was harassed by her immediate supervisors; her complaints center around conduct by her co-workers. (Dkt. No. 60). Thus, she must establish that Mylan both knew about the alleged harassment and also failed to take proper remedial action "reasonably calculated to end the harassment." <u>Id</u>. at 565.

Dooley contends that her complaints were not taken seriously by Mylan. (Dkt. No. 60). The undisputed evidence adduced by the

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

parties, however, is to the contrary: Mylan undertook or attempted to undertake proper remedial actions each time it became aware of Dooley's complaints.

Regarding the post-it note incident, Dooley waited over a year to report the incident to Mylan, (Brunette Aff. ¶ 23, Ex. T), and refused to produce a copy of the post-it note at issue when Mylan attempted to initiate an investigation of the matter. Id. at ¶ 27. Additionally, Mylan took proper remedial actions respecting Dooley's non-race related complaints. Concerning the e-mail messages under review, Brunette investigated Dooley's first set of complaints, and counseled both Jones and Barker on Mylan's harassment policy. (Brunette Aff. ¶ 20). Pirozzi attempted to conduct an investigation regarding Dooley's second set of e-mail related complaints, but following his denial of her request to bring her attorney rather than the approved union representative to the meeting, Dooley rebuffed his attempt to schedule a second meeting to discuss the matter further. (Goletz Aff. ¶ 10, Ex. Z).

Such evidence does not support even an inference that Mylan knew of problems yet failed to take proper remedial actions to address Dooley's complaints. On the contrary, Mylan either acted on the complaints, or attempted to act on them but could not in the

**MEMORANDUM OPINION AND ORDER GRANTING MYLAN PHARMACEUTICALS INC.'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 141]**

face of Dooley's lack of cooperation. Mylan therefore may not be held liable for Dooley's alleged harassment.

## C.  Retaliation (Counts Two and Five)

Dooley asserts claims against Mylan for retaliation pursuant to Title VII, Section 1981, and the Human Rights Act. (Dkt. No. 60). She argues that Mylan retaliated against her by suspending her on June 12, 2009 for misusing bereavement leave. When Dooley signed the Last Chance Agreement with Mylan, however, she voluntarily agreed not to file any action or complaint challenging or protesting any action taken by Mylan before June 24, 2009. Her claims for retaliation violate this agreement, and therefore must be dismissed.

## D.  Intentional Infliction of Emotional Distress (Count Seven)

Finally, Dooley asserts a claim for intentional infliction of emotional distress based on the racial discrimination and harassment to which she was allegedly subjected while working at Mylan. (Dkt. No. 60). The underlying factual allegations upon which she bases this claim are the same ones on which she relies to support her discrimination and harassment claims. Because Congress has provided a separate statutory remedy for her discrimination and harassment allegations under Title VII of the Civil Rights Act of 1964, Dooley is barred from bringing a separate claim for emotional

distress. <u>See</u> <u>Knox v. Wheeling-Pittsburgh-Steel Corporation</u>, 899 F. Supp. 1529, 1535 (N.D.W.Va. 1995); <u>Guervara v. K-Mart Corporation</u>, 629 F.Supp. 1189 (S.D.W.Va. 1986); <u>Taylor v. City National Bank</u>, 642 F.Supp. 989, 998 (S.D.W.Va. 1986). Thus, her claim for intentional infliction of emotional distress is preempted by the statutory remedies available to her.

### V. <u>CONCLUSION</u>

For the reasons discussed, the Court **GRANTS** Mylan's motion for summary judgment, **DISMISSES WITH PREJUDICE** Dooley's complaint, **DENIES AS MOOT** all pending motions, and **DIRECTS** the Clerk to remove this case from its active docket.

It is so **ORDERED.**

Pursuant to Fed. R. Civ. P. 58, the Court directs the Clerk of the Court to enter a separate judgment order and to transmit copies of both Orders to counsel of record.

DATED: April 30, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE